# CHARLESTON.

## Boggess *v.* Richards's Adm'r *et al.*

Submitted June 12, 1894.—Decided December 1, 1894.

1. CONTRACT—MARRIAGE—CONSIDERATION.

   Marriage in an antenuptial contract is a valuable consideration; and such contract can not be impeached by existing creditors as fraudulent, unless it be shown that both parties thereto participated therein or had notice of fraudulent intent.

2. LIMITATIONS OF ACTIONS.

   The statute of limitations, as provided in section 14, c. 104, Code, has no application to contracts founded on a valuable consideration but is limited by the wording of the statute to contracts on consideration not deemed valuable in law.

3. HUSBAND AND WIFE—SEPARATE ESTATE—DEBTOR AND CREDITOR.

   A husband may engage in business with his wife's capital in her name and on her credit for her benefit; but if owing to his skill and labor large profits accrue therefrom over and above the necessary expenses and indebtedness of the business including the support of himself, wife and family, a court of equity will justly apportion such profits between his wife and his existing creditors.

J. BASSEL for appellant cited Code, c. 74; 11 W. Va. 122; 22 W. Va. 671; 24 W. Va. 199; 37 W. Va. 373; 2 Rob. 719; 7 W. Va. 499; 17 Gratt. 205; 49 Ind. 393; 18 W. Va. 75; 5 C. E. Green 13; 37 W. Va. 242; 36 W. Va. 11; 25 W. Va. 242.

E. MAXWELL and M. M. THOMPSON for appellee cited 24 W. Va. 702; Code, c. 74, s. 4; 16 W. Va. 686; 3 Gr. Ev. 155; Id. 307; 25 W. Va. 127; 34 W. Va. 456; Code, c. 125, s. 36; 11 W. Va. 586; 7 W. Va. 499; Id. 707; 2 Am. & Eng. Ency. L. 210; 46 Ind. 393; 18 W. Va. 75, 99; 55 Ill. 352; 44 N. Y. 343; 2 Head 514; 5 Sneed 39; Code, c. 66, s. 13; 34 W. Va. 516; 34 N. Y. 293; 27 N. Y. 277; 1 Bish. Mar. Wom. § 57; 2 Bish. Mar. Wom. §. 72, 158, 159; 22 W. Va. 356.

| 39 | 567 |
| 39 | 579 |
| 39 | 567 |
| 40 | 435 |
| 39 | 567 |
| f46 | 391 |
| 46 | 395 |
| 39 | 567 |
| 54 | 463 |
| 54 | 466 |
| 39 | 567 |
| 55 | 435 |

DENT, JUDGE :

In the Circuit Court of Harrison county, at April rules, 1890, plaintiff filed his bill in chancery against the defendants, alleging, among other things, that on the 30th day of May, 1887, he obtained a judgment against the defendant Wilbur F. Richards for the sum of four hundred and twenty dollars with interest from date, and twenty two dollars and seventy cents costs, because of a libel published on the 12th day of July, 1884, which judgment was in full force and wholly unpaid;—that said Richards at the time of such libellous publication was the owner of a large amount of property, but that on the 17th day of November, 1885, with intent to delay, hinder and defraud the plaintiff he entered into a pretended marriage contract with defendant, at that time Melissa McCleary now Richards, by which in consideration of marriage he transferred and conveyed all his known property to her, she participating in his fraudulent intent ; this contract was not admitted to record until May 26, 1886 ;—that after the marriage said Richards retained possession of all said property, amounting to about seven thousand dollars, and used and managed the same as though it were his own ;—that he was a practical printer and with part of the money realized from said property, or rather with part of the property itself, he purchased the fully equipped plant of the paper known as the "Clarksburg Telegram" and printed and edited a paper, and so used and managed the property conveyed by said marriage settlement, that from about seven thousand dollars in 1885 it amounted to upward of fourteen thousand dollars in 1890, all due to the skill, labor, and management of said Richards ; —that with a part of the proceeds of said property he purchased in his wife's name a certain lot and erected a valuable house thereon—all which he alleges was in fraud of his rights as a creditor of said Richards, and was fully participated in by his said wife ; and he prays for a sale of said property and the payment of his debt, interest and costs thereof. Numerous interrogatories are propounded for the defendants to answer.

The defendants file their separate answers under oath to the bill and interrogatories, in which they virtually

admit the facts as herein repeated from said bill, but deny all fraud or knowledge of fraud, or that any of the various transactions fully set out in said answers were made or done with any fraudulent intent. All of plaintiff's interrogatories are fully and at length answered. Plaintiff replied generally. Afterwards, by leave of the court, and over the objection of plaintiff, respondents filed a supplemental answer setting up and pleading the statute of limitations.

At the September term, 1893, the court entered a final decree dismissing plaintiff's bill, from which this appeal is taken.

The first question presented is: Did the court err in allowing the defendants to file a supplemental answer pleading the statute of limitations? Section 14, c. 104, of the Code, on which defendants rely, is in these words: "No gift, conveyance, assignment, transfer or charge not on consideration deemed valuable in law shall be avoided either in whole or in part for that cause only, unless within five years after it is made suit be brought for that purpose," *etc.* This section does not apply to contracts, which are upon consideration deemed valuable in law, but is expressly limited to voluntary contracts. The contract in this case was not only on consideration deemed valuable in law, but on the highest consideration known to the law, to wit: marriage. As has been said, though the common-law abhors every sort of cheating, it loves matrimony. The law regarding such contracts is laid down in these words, to wit: "However much a man may be indebted, an antenuptial settlement, made by him in consideration of marriage, is good against his creditors, unless it appears that the intended wife was cognizant of the fraud. And, even though it conveys his whole estate, it is not simply, on that account, void; and, when a settlement is made in contemplation of marriage, the law presumes it was an inducement to it, and the courts can not assume the contrary to be the fact." *Herring* v. *Wickham,* 29 Gratt. 628; *Coutts* v. *Greenhow,* 2 Munf. 363.

Such being the nature of this contract, it could not be avoided under section 2, c. 74, of the Code, but only under

section 1 of the same chapter, because it was made with intent to delay, hinder and defraud, and the statute of limitations is no bar to such a charge. See *Hutchinson's Ex'x* v. *Boltz*, 35 W. Va. 754 (14 S. E. Rep. 267). The statute of limitations was improperly pleaded; but was the plaintiff prejudiced thereby? Mrs. Richards, née McCleary, was a purchaser for valuable consideration, and, to make the property transferred to her liable, it must be alleged and shown that she had notice of or participated in the fraud, if any, of her intended husband. This the plaintiff has wholly failed to do, and for all the purposes of this suit the marriage contract must be held valid, binding and unimpeached, and all the property transferred thereby as the sole and separate property including the rents, issues and profits thereof of the female defendant, wholly free and acquit from any liability to her husband's indebtedness.

The plaintiff objects that this contract not being identified by date in the certificate of acknowledgment was improperly admitted to record. In the case of *Adams* v. *Medsker*, 25 W. Va. 127, this Court has completely answered this objection.

The plaintiff further insists that, the property in controversy being the property of a married woman, notwithstanding the fact that the bill propounds interrogatories under oath, and the answer responds to the interrogatories under oath because there is a general replication—under the holdings of this court the female respondent must prove that the property was purchased with funds not derived from her husband. Now, the bill alleges, and the respondent admits, that the funds were derived from her husband and states the manner of the derivation directly in accord with the discovery sought. If the answer admits the facts stated in the bill, what is left for the defendant to prove? The defendant admits that she received the property through the very transactions, which the plaintiff alleges she had with her husband; but she denies that these transactions were fraudulent either in fact or law. The facts being undisputed, it devolves upon the court to say whether they are such, that fraudulent intent on the part of the husband with fraudulent knowledge on

the part of the wife can be inferred, or, if not, whether constructive legal fraud can be imputed to her.

Taking the whole history of the transactions of the husband as set out in this case, it clearly appears, that it was the intention of the defendant husband to place his property in such condition that the plaintiff could not possibly succeed in making his judgment; and nowhere is this more apparent than in the duplicate answers which he has had prepared—one, no doubt, as agent, and the other as principal—for himself and wife, and filed herein. It is plain from these answers, that the husband either through information from his legal advisors, or through his own study of the subjects, believed that he had all the property in controversy thoroughly armor-plated against the assaults of the plaintiff, and therefore he appears to take special delight in showing how skillfully he has managed to increase the value of his wife's separate estate magnificently, and yet secured it beyond the reach of the clutches of his own creditors. The exultation at the success of his scheme and the fraudulent intent of the husband are nowhere more apparent than when he gives utterance to the following false profession: "Respondent regrets that his financial circumstances are so poor, but he hopes that with the blessing of good health, industry and economy he will yet be able, not only to pay his legal debts, or to have property of his own out of which the same may be made or paid, for it is disagreeable and annoying to respondent to owe any debt to any person." This, coming from a man who in the same answer apparently prides himself on the fact that by his ingenuity, skill, and good management he has succeeded in getting over fourteen thousand dollars in his wife's name in less than five years, besides supporting his family, and who owes less than one thousand and five hundred dollars, evidences a lack of sincerity on his part that amounts to almost positive proof, that he considers himself under no obligation to pay the plaintiff's claim but justified in evading it in any available manner. It is true, this debt was not one of his own contracting; but the law has made him liable for it, and therefore it is just as binding on him as a law-abiding citizen as any other obligation.

But it is not so with the defendant wife. She is guilty of no fraud in fact, nor has she been shown to have any knowledge of his fraudulent intent; on the contrary, she appears to be wholly innocent even from the suspicion of actual fraud ; and the only question is :—Will the law impute to her fraud from the fact that she became the substantial beneficiary of her husband's fraudulent purpose ?

Having reached the conclusion, that the marriage-settlement was good and valid from at least the day of its recordation, May 26, 1886, against all creditors of the husband both existing and subsequent, it becomes unnecessary to investigate any of the transactions of the husband except such as were subsequent to that date. The property, which became the sole and separate property of the defendant wife by virtue of said contract was as follows, to wit: Three notes known as the "Hustead notes," amounting to three thousand two hundred and fifty dollars ; three notes known as the "Thompson notes," amounting to one thousand and seven hundred dollars; a judgment against E. T. Baldwin, six hundred dollars; one note on Joseph Murray, one thousand dollars; one note on Stewart Webster, one thousand dollars ; also, a rental interest in a two-story brick block on Main street, Clarksburg, W. Va. This property the husband took possession of, as he had a right to do under the law, and continued to manage for her use and benefit, and realized therefrom the sum of six thousand five hundred and twenty dollars. The amount, that was never collected, does not appear ; but it was certainly something which under the marriage agreement he would be in duty bound to make good to her, as it is to be presumed, that, when he made the transfer in consideration of marriage, he represented that all said claims were as good as gold, after the usual manner of men in similar circumstances. He made several investments in real estate and gas and electric-light stock, which were all legitimate, and from none of which she received much more in return than the principal invested. It is therefore unnecessary to consider any of these, as there is no pretence that any of them could be treated as fraudulent with the single exception of the transaction in relation to the newspaper-plant.

About the 1st day of April, 1886, the husband, having caused the newspaper plant known as the "Telegram" to be sold under a deed of trust given to secure the Hustead notes of three thousand two hundred and fifty dollars, and the same having been bought in for the wife at the price of one thousand four hundred dollars, credited on said notes, began in the name and as the agent of his wife to carry on said newspaper business, and continued the same up until the 1st day of December, 1890, when he sold the whole plant, including the balance of the lease on the building, for the sum of three thousand and five hundred dollars, which he turned into his wife's estate, and which probably fully compensated her for her loss on the Hustead notes.

In the answer of the wife, repeated in the answer of the husband, is the following statement: "Respondent had confidence in the honor and integrity of her said husband as her agent, and committed to him, as her agent, the conduct and management of said newspaper, its presses, *etc.*, to a very great extent, depending upon his honesty and integrity and skill in the correct and proper management of said newspaper, presses, *etc.*, in her interests and as her property and business;" and "respondent, in answer to the ninth interrogatory of plaintiff, says that the amount of profits made from the Telegram newspaper property, including job work connected with said newspaper office, from the 1st day of April, 1886, until December 1, 1890, was at the average rate of from one thousand two hundred dollars to one thousand five hundred dollars *per annum*. Respondent is satisfied that the amount of said profits *per annum* during the time last aforesaid was upon an average not less than one thousand two hundred dollars nor more than one thousand five hundred dollars; so that the aggregate amount of said profits made from the said Telegram newspaper, including the job work connected with said newspaper office, was, as respondent verily believes, during said last-mentioned time, not less than five thousand and six hundred dollars, nor more than seven thousand dollars."

In another part of their separate answers it is stated that part of this amount was used in support of the family, leaving a net balance, however, of not less than five thou-

sand dollars. Now, it is easy to be seen that the husband's labor and skill, he being an efficient and practical printer, produced this large profit. The question presents itself, has a husband who is skilled in any particular branch of labor the right to bestow all his time, labor and skill to the increase of his wife's separate estate, and allow his just legal obligations to go unpaid? It has been settled by numerous and repeated decisions that it matters not how much of his labor and skill a man may devote to his wife's property; and, although it may be changed from a rude to a manufactured state, it remains her property still, and can not be levied on by execution or attached for his debts. *Miller* v. *Peck*, 18 W. Va. 99; *Atwood* v. *Dolan*, 34 W. Va. 563 (12 S. E. Rep. 688).

A court of law affording no remedy, what will a court of equity do? In Bump on Fraudulent Conveyances (page 250) the law is stated to be: "An arrangement by which the husband acts as his wife's agent without any compensation, or for a compensation that is insufficient, is in effect an attempt to make a voluntary conveyance of the products of his skill and labor in her favor, and is void against his creditors;" and on page 251: "A debtor may, therefore, bestow his skill and labor upon his wife's estate, so far as may be reasonably necessary, without rendering the products liable to his creditors. He may do even more than that. As his first obligation is to support his family, the products of the land will not be liable for his debts, until that obligation is discharged, and even then they will not be liable, unless the portion not needed for the support of the family is the result of his labor; but, if there is any such surplus that is the result of his skill, there is no reason why it may not be reached in equity and appropriated towards the payment of his debts." *Shackleford* v. *Collier*, 6 Bush. 150; *Murphin* v. *Taylor*, 16 Ohio St. 509. In the latter case it is said:

"The arrangement between the husband and wife, whereby he undertook to carry on business in her name and for her exclusive benefit, was in effect an attempt to make a voluntary settlement of the products of his skill and industry in favor of his wife."

In the case of *Penn* v. *Whitehead*, 17 Gratt. 527, Judge Moncure says : "Now, I take it to be a sound principle of law that by no agreement or arrangement between husband and wife alone, founded on no valuable consideration, can the profits of the future labor of either of them, much less of the husband alone, be secured to the use of them or either of them, or their family, in exclusion of the claims of their creditors existing at the time such agreement or arrangement is made ; and any such agreement or arrangement entered into for the purpose of having that effect would be a mere contrivance to hinder, delay, and defraud creditors, and would be null and void as to such creditors, according to the true intent and meaning, if not the literal terms of the statute." * * * "No one will contend that such profits can thus be secured to the husband alone, in exclusion of the claims of his creditors. Nor can they any more be thus secured to the use of his wife and family, at least in exclusion of the claims of existing creditors." * * * "To be sure, the law can not, or does not, compel a man in advance to labor for his creditors." They have no lien or mortgage on his person. "And if he chooses to be so dishonest as to idle or give away his time, rather than labor for the means of paying his debts, the law can not and does not attempt to prevent it." * * * "A man is not apt to give away his labor, or even idle away his time. If he is not honest enough to wish to pay his debts, self-interest prompts him to do something, and to try to secure to himself and his family the profits of his skill and labor. This motive of self-interest is generally sufficient, without being assisted by legal means, to stimulate a man into action, and prevent him from throwing or giving away his time, instead of trying to make a profitable use of it; and the law, instead of attempting to apply such stimulus, contents itself with subjecting any profit he may make for himself or family to liability to the payment of his debts aforesaid."

In the case of *Trapnell* v. *Conklyn*, 37 W. Va. 242 (16 S. E. Rep. 570) this Court stated the law as follows: "(4) The fact that an insolvent husband voluntarily bestows his labor and skill in the business of farming carried

on by his wife upon land which is her separate property, and operated with her separate property, will not, in the absence of fraud, render the products the property of the husband, and liable for his debts. If such products, after the support of the family, leave a surplus in property attributable to his skill and labor, equity would make a just apportionment between wife and creditors."

From these and other numerous authorities examined there can be no other conclusion reached than that if a man skilled in any employment does business in his wife's name with the capital furnished by her, and large profits over and above the necessary expenses of the business including the support of himself, wife and family accrue therefrom, owing to his skill and experience, and he turn such profits over to his wife or invest them in property for her, a court of equity will treat such arrangement as fraudulent, and will make an equitable distribution of such profits between the wife and existing creditors of the husband. Not that the wife is guilty of any actual fraud, but her hand be it ever so chaste is polluted by receiving as a gift from her husband the funds which he is endeavoring to fraudulently conceal under the cloak of her separate property from the searching eyes of his creditors.

According to the admission of both of the defendants in this case the husband doing business with his wife's capital, and in her name and for her benefit by his skill, labor and management during a period of four years and nine months succeeded in making a net profit of not less than five thousand dollars above all necessary expenses including the support of himself, wife and family, partly supplemented by the revenues of the husband from other sources. The only way that the law furnishes for the ascertainment of how much of this handsome profit is due to the skill and labor of the husband is to deduct therefrom the legal interest on the amount of the capital invested. The plant, which was worth much more, was purchased for the wife at the price of one thousand four hundred dollars; but as she lost the balance of the Hustead notes of three thousand two hundred and fifty dollars, and the plant was afterwards sold for her at the price of three

thousand five hundred dollars, it is no more than equitable that her investment should, be treated as this latter sum. The legal interest on three thousand five hundred dollars' for four years and nine months—the time the business was carried on in her name—is nine hundred and ninety seven dollars and twenty cents, which deducted from the five thousand dollars leaves the net balance of four thousand and two dollars and eighty cents, representing the husband's skill and labor, which he voluntarily and gratuitously merged into her separate estate for the evident purpose of evading the legal liabilities incurred by him, though small in amount, for his wrongful and illegal treatment of the plaintiff and others. He justifies his course for the reason that they were not debts of his own contracting but liabilities imposed upon him in legal proceedings, in which he was not dealt with justly, and therefore he is under no moral obligation to pay them, but has the right to fight the law with the law and evade them if possible.

The maxim of the moral law is tooth for tooth, eye for eye, reputation for reputation, property for property, and life for life, or what is called " restitution in kind." Human ingenuity and wisdom could not devise a practical plan for carrying out this maxim without the infliction of the greatest cruelties, and often times the greatest injustice. So, leaving the equality which this law demands to the final arbitrament of Him who can weigh the motives and intentions, and from whom no secret is hidden, and on whom no deception can be successfully practiced, the common-law, in cases of injury to property, person, or reputation provides a pecuniary reparation in the way of compensation to the injured party, and also furnishes the means of ascertaining the damage inflicted ; and when that is once fixed and determined by its judgment, it regards the duty of payment just as sacred and binding as any voluntary obligation assumed by the party, nor will it lend its aid in any manner whatever to him who is endeavoring to hinder, delay and defeat the collection of such a judgment. Owing to its feeble administration, it may sometimes appear impotent ; but inconsistency and duplicity are no

part of its nature. On the contrary, it hates fraudulent pretences and practices and loves honesty and fair dealing and will furnish every means to ferret out and bring to light the hidden resources and property of him who is endeavoring to defeat the collection and escape the payment of a legal obligation, be it the result of a contract self-imposed or a forfeiture for a wrong self-committed.

Since the institution of these proceedings death has summoned the husband defendant before a higher tribunal, where we can expect equal retributive justice mercifully meted out; but the property which resulted from his skill and labor, and with which he should have satisfied his legal obligations, is still in the hands of his widow and commingled with her estate, and the plain though painful duty devolves on the Court of requiring her to surrender a sufficient amount thereof to pay the plaintiff's judgment. Her coverture being removed, there is no legal barrier to a personal decree against her; but, if she prefers the proceedings to continue against the property in controversy, it will be proper and necessary for the plaintiff to amend his bill and bring James M. Lyon, who appears to be a purchaser not *pendente lite* of said property, before the court, that he may defend his interest therein.

The decree of the Circuit Court is therefore reversed, and this cause is remanded for further proceedings in accordance with this opinion and the rules of law and equity.

---

# CHARLESTON,

J. BASSEL, for appellant.

E. MAXWELL and M. M. THOMPSON, for appellees.