# CHARLESTON.

## DENT *v.* PICKENS *et al.*

### BRANNON JUDGE, *Concurring.*

Submitted September 15, 1898—Decided April 15, 1899.

1. CONTRACTS—*Marriage—Consideration—Fraud.*

    Marriage, in an antenuptial contract, is a valuable consideration; and such contract, cannot be impeached by existing creditors, as fraudulent, unless it be shown that both parties thereto participated therein, or had notice of fraudulent intent. *Boggess v. Richard's Adm'r.* 39 W. Va. 567. (p. 391.)

2. CONTRACTS—*Marriage—Breach—Fraudulent Conveyance—Notice —Burden of Proof.*

    When a man enters into a contract of marriage with a woman, and commits a breach thereof, and she sues him for nonperformance, and during the pendency of such suit, to escape the payment of any judgment against him therein, he, under cover of a second contract of marriage with another woman, and under pretense of consideration therefor, conveys all his property, thus rendering himself hopelessly insolvent, if the facts and circumstances are sufficient to justify the presumption of notice to the grantee, of the fraudulent intent of the grantor the burden of proof is shifted to such grantee, and it devolves upon her to prove want of such notice; and, if she fails to testify with regard thereto, such presumption becomes conclusive. (p. 391.)

3. CONTRACTS—*Marriage—Fraudulent Conveyance—Notice.*

    The facts and circumstances which tend to show notice or knowledge of fraudulent intent on the part of the grantee, the nature, character, and manner of the execution of the contract itself, and the character of the various items thereby conveyed, including a mere equity of redemption in other plainly fraudulent transfers made by him, and the explicitness with which it is set forth, the knowledge on her part of the charge of seduction, the birth of the child, and the pendency of the suit for breach of promise, it being a matter of common notoriety in the community in which she lived, were sufficient to put her on her guard and inquiry; and she must therefore be deemed to have accepted him with all his circumstances, and to have taken the risk of his escape from his first marriage contract, and thereby joined with him in his fraud to defeat a recovery on such first contract. (p. 390.)

4. Marriage—*Seduction—Common Law.*
    While the common law loves matrimony, it abhors deceit, fraud,
    and seduction, and will not permit matrimony to be used by a
    guilty person to escape the consequences of his fraudulent, de-
    ceitful and unlawful conduct.  (p. 391.)

Appeal from Circuit Court, Barbour County.

Bill by Susan C. Dent against Dever Pickens and others.
Decree for defendants, and plaintiff appeals.

·  *Reversed.*

J. Hop Woods and Edwin Maxwell, for appellant.

Dayton & Dayton, J. J. Davis, and John Bassel, for
appellees.

McWhorter, Judge:

On the 27th day of January, 1888, Susan C. Dent in-
stituted her action at law in Barbour circuit court against
Dever Pickens to recover damages against him for an
alleged breach of promise of marriage, and laid her dam-
ages at twenty-five thousand dollars.   On the 14th day of
January, 1889, while said action was pending, and before
it was tried, the said defendant, Pickens, executed to John
J. Davis and A. G. Dayton, trustees (two of his counsel in
said action), a deed of trust upon all the real estate owned
by him, consisting in all of about five hundred and seventy-
one acres:  First. A tract of eighty-six and a fraction
acres, purchased by said Dever from said Dayton, special
commissioner; also, a tract of eighty-eight and one-half
acres adjoining  the eighty-six acres, purchased from S.
V. Woods, special commissioner:   First, to secure Alston
G. Dayton, special commissioner, the sum of two thousand
and sixteen dollars and sixty-six and two-third cents with
interest from March 8, 1887, balance purchase money on
said eighty-six acres; second, to secure S. V. Woods, special
commissioner, two thousand one hundred and twenty-nine
dollars, with interest from March 8, 1887, subject to a credit
of five hundred and fifty-six dollars as of April 1, 1888,
balance of purchase money on said tract of eighty-eight
acres, to be first paid out of the proceeds of said tracts,
respectively; then to secure J. W. Greathouse a debt of
three hundred dollars; to Edward McDaniel three hundred
and thirty-two dollars and sixty-three cents, subject to a

credit of fifty dollars; to M. D. Reed, seventy-eight dollars and thirty-eight cents, balance of a five hundred dollar debt; to C. D. Paugh, a debt of three hundred dollars; to R. M. Boring, a debt of one thousand three hundred and twenty dollars and eighty cents, subject to a credit of one hundred and twenty-five dollars which last said debts were to be paid ratably out of the proceeds of said two tracts, except that the debt of R. M. Boring should be paid only after the other debts secured were paid out of the proceeds of the sale of said two tracts; then conveyed a tract of three hundred and ninety-six acres, being the home farm of James Pickens, devised to said Dever Pickens, to secure the said debt of one thousand three hundred and twenty dollars and eighty cents to R. M. Boring, in case the same should not be realized out of the said two tracts; two thousand five hundred dollars to said Dever's mother, A. M. Pickens, with interest from October 1, 1887, subject to a small credit, and two thousand one hundred and thirty-nine dollars, with interest from January 1, 1889; also, to secure five thousand dollars to the estate of James Pickens, deceased, defendant's father,—he being one of the executors of said estate.     The trust deed further provided that, in case the said debts should not be paid within twelve months from the date of the deed, it should be the duty of the trustees to sell the first two mentioned tracts of land for sufficient cash to pay the expenses of sale, including their commissions, and the purchase money due thereon, and the residue upon a credit of one, two, and three years, and to sell said three hundred and ninety-six acres for cash, and out of the proceeds of the three hundred and ninety-six acres pay its part of the expenses of sale, including the lawful commissions for selling; then pay the debts in the order secured, and of the proceeds of the sale of the said two tracts first mentioned pay the debts therein secured; and it also provided for notice of sale.     On the 10th day of May 1889, said Dever Pickens entered into a marriage contract with Minnie B. Coburn, by which he undertook to convey to her, in consideration of marriage the following chattels, notes, evidences of debt, and choses in action, to wit: "The rest and residue of the debt due said Dever Pickens from M. W. and Ledrue Coburn, and secured by deed of trust to Alston G. Dayton and James Pickens,

trustees, dated December 21st, 1885, after deducting therefrom one thousand dollars assigned January 14th, 1889, to Mollie Pickens; one note made to said Dever by A. S. Pickens on the 9th day of August, 1888, for three hundred dollars, due on demand; one other note made to said Dever by A. S. Pickens on the 18th day of June, 1889 and due one day after date, for thirty-five dollars; one note also made to said Dever by M. S. Cleavenger on the 17th day of September, 1888, for one hundred and forty-six dollars and fifty cents, due one day after date; also, one other note made to said Dever by Mollie Pickens on the 9th day of February, 1889, for one hundred and fifty dollars, due one day after date; one other note also made to said Dever by A. H. Young on the 15th day of February, 1889, for. four hundred and ten dollars, payable one day after date; also, one other note for thirty-six dollars made to said Dever on the 12th day of January, 1889, by Emma Walker, payable one day after date; one other note made to said Dever by John D. Pickens on the 1st day of May, 1889, for five hundred dollars, payable on the expiration of the term of a lease made to said John D., as lessee, should he occupy for the full term without interruption; also, one other note made to said Dever by said John D. Pickens on the 25th day of April 1889, for twenty dollars, due on demand." And he further granted and conveyed to her, subject to the deed of trust made to Dayton and Davis, trustees, all his right, title, and interest in and to that certain tract of land situated in Barbour County, containing three hundred and ninety-six and three-fourths acres, devised to him by his father, and also all the right, title, interest, and estate to which he was then, or might thereafter be, enitled in the property or estate, whether personal or real, of his father, the said James Pickens, under and by virtue of the twelfth and fourteenth clauses or items of the will of said James Pickens.

On the 24th of January, 1889, the plaintiff, Dent, brought her suit in equity in said court against Dever Pickens (in his own right and as executor of James Pickens), John D. Pickens (executor of James Pickens), A. G. Dayton (trustee), John J. Davis (trustee), S. V. Woods (special commissioner), A. G. Dayton (special commissioner), J. W. Greathouse, Edward McDaniel, Milton D. Reed, C.

D. Paugh; R. M. Boring, and N. M. Pickens, and filed her
bill at the February rules, 1889, assailing the deed of trust
made on the 14th of January, 1889, as to the claims therein
secured to his mother, A.M. Pickens, his sister, R. M. Bor-
ing, and to the estate of James Pickens, deceased, alleging
that the said claims were fraudulent, and that the trust
deed was executed to hinder, delay, and defraud plaintiff
in the collection of any judgment she might recover, and
alleging that said Dever was converting his property, or
a material part thereof, into money and securities, with
the intent to defraud her in the collection of her said debt
or demand, and that with like intent he had executed the
said deed of trust on the 14th of January, 1889, and that
said debts secured to R. M. Boring, A. M. Pickens, and
the estate of James Pickens, aggregating about eleven
thousand dollars, were voluntary and fraudulent, and that
the said creditors, executors, and trustees had full notice
thereof.    Dever Pickens filed his answer denying the mate-
rial allegations of the bill, and the fraud in executing the
said deed of trust, and denying that said debts were vol-
untary or fraudulent.    Defendants A. M. Pickens, R. M.
Boring, and John D. Pickens also filed their separate an-
swers to the same effect.    At the July term, 1889, the
action at law was tried, and a verdict of a jury rendered
in favor of plaintiff for ten thousand dollars upon which
judgment was entered for ten thousand dollars, with inter-
est from July 20, 1889, until paid, with six hundred and
forty-six dollars and seventy-seven cents.

At the September rules, 1889, plaintiff filed her
amended bill against the same parties named, and also
against Minnie B. Coburn, M. W. Coburn, Ledrue Coburn,
Mollie Pickens, A. S. Pickens, M. S. Cleavenger, A. H.
Young, Emma Walker, and John D. Pickens in his own
right alleging the judgment rendered on the 23d day of
July, 1889, for ten thousand dollars, and assailing the mar-
riage contract made May 10, 1889, between Dever Pick-
ens and Minnie B. Coburn, as fraudulent, and made for the
purpose of hindering, delaying, and defrauding plaintiff in
the collection of her said debt, and charging knowledge of
the said fraud upon the said Minnie B. Coburn; further
alleging that on the 31st of August, 1889, the caused an ex-
ecution to be issued upon said judgment and placed in the

hands of the sheriff, and on the same day had the same docketed in the clerk's office of the county court of said county, and thereby acquired and continued the lien of said execution upon the debts transferred by said defendant Pickens to said Minnie B. Coburn, whereof the said M. W. Coburn, Ledrue Coburn, A. G. Dayton, surviving trustee of himself and James Pickens, deceased, in the deed of trust dated December 21, 1885, mentioned in said contract, Mollie Pickens, A. S. Pickens, M. S. Cleavenger, A. H. Young, Emma Walker, and John D. Pickens in his own right, had due notice, and had also notice of the fraudulent purpose of the said defendant Pickens in making said contract; that, since the filing of the original bill, Dever Pickens had abandoned this State, and was living in one of the far-western states, as had also the said Minnie B. Coburn, who was the daughter of M. W. Coburn, and the niece of Ledrue Coburn, both of whom were insolvent; and praying that her judgment be declared a lien upon the real estate owned by said Dever, and conveyed by him to trustees Dayton and Davis by the said deed of January 14, 1889; that the same might be set aside as fraudulent as to plaintiff's debt, from the institution of her said suit, to wit, January 24, 1889, and that the debts secured in said deed of trust to the estate of James Pickens, A. M. Pickens, and R. M. Boring be declared fraudulent; that the lien of plaintiff's execution upon said judgment be enforced against the choses in action and debts due from the defendants Mollie Pickens, A. S. Pickens, John D. Pickens in his own right, S. M. Cleavenger, A. H. Young, Emma Walker, M. W. Coburn, and Ledrue Coburn to said Dever Pickens, and that they be restrained from paying the same, or any part thereof to the said Minnie B. Coburn, and that said Dayton, surviving trustee, be in like manner restrained, and that said debts be decreed to be paid to plaintiff; and that said marriage contract be declared fraudulent and void. Defendant obtained from this court a writ of error upon said judgment, and upon the hearing the judgment was reversed, and a new trial awarded. The case was again tried at the February term, 1892, and verdict and judgment for nine thousand dollars, with interest from the 27th day of February, 1892, and nine hundred and seventy-one dollars and thirty-four cents costs, awarded.

On the 13th day of March, 1893, plaintiff sued out her summons against the same defendants to answer her second amended bill, and on the first Monday in April, 1893, filed said bill, alleging the recovery of the second judgment for nine thousand dollars, interest and costs; that execution was issued on said judgment, and the same docketed in the county court clerk's office on the 3d of March. On the 7th day of April, 1893, plaintiff filed her notice of lis pendens in said county court clerk's office. On the first Monday in April, 1893, plaintiff filed her second amended bill, realleging all of the material allegations in her original and former amended bills, and especially charging that the antenuptial contract entered into between Dever Pickens and Minnie B. Coburn, and consummated by their subsequent marriage, was executed for the purpose of hindering, delaying, and defrauding plaintiff in the collection of her debt, for which purpose suit had been instituted on the common-law side of that court on the 27th day of January, 1888, prior thereto, of all of which the said Minnie Coburn had full and complete notice, both of said suit and fraudulent purpose of Pickens, and alleging, also, the insufficiency of the execution and acknowledgement of said contract of marriage; alleging, also, that the claims owing by the said persons mentioned in the said assignment were bound by the execution docketed as aforesaid, and that the one thousand dollars mentioned in said contract as part of the debt due to said Dever Pickens, secured by the trust of said M. W. and Ledrue Coburn to said Dayton and James Pickens (who is now deceased), trustees, dated December 21, 1885, was fictitious and fraudulent, of which said Mollie Pickens had due notice, as did also the said Dever Pickens and the surviving trustee, Dayton, and, if not paid, is bound by the lien of plaintiff's said execution, and, if paid, was paid in fraud of plaintiff's right in the premises, and said Mollie Pickens will be made to respond to the plaintiff for the amount thereof; and praying that said Mollie Pickens may be made to respond to the plaintiff in case she had received said money; that the contract be declared void and fraudulent as to plaintiff, and the trust of January 14, 1889, as to the debts secured therein to the estate of James Pickens, A. M. Pickens, and R. M. Boring, be declared fraudulent and void; and that

the lien of said execution to be enforced against the debts due to said Pickens from the defendants Mollie Pickens, A. S. Pickens, John D. Pickens in his own right, M. S. Cleavenger, A. H. Young, Emma Walker, M. W. Coburn, Ledrue Coburn, and they be restrained, and enjoined from paying the same to anybody but the plaintiff. Defendant Minnie Pickens answered the amended and second amended bills, and denied all fraud on her part, and denied that she had complete knowledge of the fraudulent motives and purposes moving said Dever in the execution of said contract, and her active participation in the fraud, but did not deny her knowledge of the pendency of the action at law. The bills and answers are all made and filed under oath.

Depositions of various witnesses were taken by plaintiff and defendants, and filed in the cause, which came on to be heard on the 17th of November, 1896, upon plaintiff's original bill and two amended bills duly matured at rules by process executed thereon, and order of publication duly taken therein, the answers of A. M. Pickens, John D. Pickens, executor of James Pickens, Dever Pickens, and R. M. Boring to said original bill, the answers of Dever Pickens and Minnie Pickens to said first amended bill, and answers of said Dever and Minnie Pickens to the second amended bill, general replication to all of said answers, exhibits filed with said bills and answers, depositions of witnesses, and was argued by counsel, whereupon the court was of opinion, and did adjudge, from the pleadings and proofs, that the deed of trust executed on the 14th day of January, 1889, by Dever Pickens to defendants Dayton and Davis, trustees, which was assailed in said original bill, and the marriage contract executed by said Dever Pickens and Minnie B. Coburn on the 10th day of May, 1889, assailed by said amended bills, were not fraudulent, but were in all respects *bona fide,* conveyances, free from fraud, and that, therefore, the plaintiff was not entitled to the relief prayed for in the bills, and the same were dismissed, with costs, from which decree this appeal is taken by the plaintiff, and the following errors assigned: "(1) It was error not to decree the said trust deeds and said marriage contract fraudulent and void as to plaintiff's claim. (2) It was error not to decree the same as a lien upon the real estate conveyed in said trust as of the date of the institution of said

suit under which said original bill was filed, according to the statute in such case made and provided. (3) It was error not to charge the defendant Mollie Pickens, the sister of defendant, with the value of his estate paid to her pending this controversy. (4) It was error to dismiss plaintiff's suit, the onus being upon the beneficiaries in said trust, the said trustees, and the parties to said marriage contract, to show the perfect good faith of both transactions. (5) And for other errors apparent upon the face of said record and proceedings to be hereafter assigned in argument."

Are the grounds sufficient for setting aside the trust deed of January 14, 1889, as to the claims aggregating about eleven thousand dollars as fraudulent? The record discloses the fact that Dever Pickens was in the years 1886, 1887, and 1888 an active business man, trading largely in stock, and farming with every appearance of success. It is shown that in the fall of 1888 he received between five thousand dollars and six thousand dollars in cash for a lot of about one hundred cattle that he had sold the fall before. He was charged on the assessor's books of his county for the purposes of taxation for the year 1886 with money and personal property in the amount of eight thousand one hundred and five dollars; for the year 1887, with four thouand two hundred and sixty-five dollars; and for the year 1888, with four thousand six hundred and ten dollars; and for the year 1889, with no assessment for personal property, but one dollar for capitation tax. Dever Pickens was one of the executors of his father, James Pickens, deceased. On the 1st day of May, 1888, the accounts of the executors of said decedent were laid before the commissioners of accounts, and the settlement completed March 16, 1889, and confirmed by the county court April 1, 1889, which settlement showed a balance in favor of Dever Pickens against the estate of four hundred and nine dollars and seventeen cents. On the 14th of January, 1889, within a month or two after he had received the sum of about six thousand dollars of his own money, he executed the deed of trust securing to his sister R. M. Boring the sum of one thousand three hundred and twenty dollars; to his mother, A. M. Pickens, about four thousand six hundred dollars; and to the estate of his father, five thousand dollars. Where shall we look for the cause of this sudden collapse of this active, vigorous, sharp-

trading young man from his high state of affluence and prosperity to a state of hopeless insolvency? The record clearly shows: That he had on hand one too many marriage contracts. It began to dawn upon his mind that the law does not allow the same latitude in dealing in the affections of the gentler sex that it does in dealing in cattle and other matters of merchandise and commerce. That early in the year 1888 he was sued upon the solemn contract which he made with the appellant, and which he had violated, and that he was likely soon to be called to respond in the damages for the breach and for his wrong (not adequate damages, however, for the wrong, for that cannot be measured or computed in dollars). So he cast about to find where he could reasonably appear that he owed some money that he could secure by trust deed on his real estate, which would cover his interest therein, and not allow the property to leave the family, and yet protect him from the fearful results of the impending judgment. He soliloquizes: "I gave my mother a note for two thousand five hundred dollars in October, 1887 which I can secure. Then there is a balance due my sister Mrs. Boring from the executors, which I can assume. Besides, I can assume that I owe my father's estate, which is a large one, five thousand dollars, and secure that; and I will assume to borrow enough more money from my mother to make the necessary amount." So the amount was made up and the deed executed. The note made by Dever to Mrs. Boring for one thousand, three hundred and twenty dollars and eighty cents bears date January 3, 1889, as copied into the record; but Mrs. Boring, in her testimony, states facts which show that the note probably was intended to bear date January 3, 1888, instead of 1889,— just about the time the dangers of a suit against him began to thicken, and he began to prepare for the storm. Appellant's child was born January 9, 1888. While the defendant Dever Pickens denied in his answers to the bill and amended bills all fraud or intent of fraud on his part in the making of the said deed of trust and the said marriage contract of May 10, he fails to make a witness of himself and subject himself to cross-examination. Upon the witness stand, Dever could have thrown much light upon many more than suspicious circumstances and transactions involved in this cause, which are not only left in the dark for

want of the light of his knowledge concerning them, in case they were honest, but the irresistable conclusion is that no explanation consistent with the truth could be made which would give color of honesty to the transactions, as far as the grantor is concerned, and that, the more light turned on, the more clearly would appear the intention on his part thereby to defeat the appellant in the collection of any recovery she might have in her action for damages. Mrs. A. M. Pickens, the mother, who was secured in the sum of more than four thousand six hundred dollars, testifies that she knew nothing of the making of the deed of trust until some time after it was executed, and knew nothing of any fraudulent intent in the making of it by said Dever. She was secure in the payment of a note for two thousand five hundred dollars dated October 1, 1887, three months before the birth of appellant's child, in January, 1888. The other note was made to her in January, 1889, dating just prior to the trust which secured it, as was also the note of Mrs. Boring. Mrs. A. M. Pickens had full knowledge of the trouble Dever was in with appellant. David Bumgardner testifies that: "In January, 1888, a few days after the birth of the child, Mr. T. L. Evans and myself went to the residence of Ann M. Pickens for the purpose of seeing Dever Pickens. Mrs. Pickens said that he was not at home; claimed that she did not know where he was at. I asked her if she knew of the trouble. She said Dever had told her all about it. I asked her if she would advise Dever to marry Miss Dent and save any further trouble. She answered she would not. Then I asked her what she was going to advise Dever to do. In a very sarcastic manner, she said she was going to advise him to get out of it the very best way he could." This is corroborated by witness T. L. Evans, who was present, and not denied by Mrs. Pickens. Bumgardner further testifies that on the following day after the conversation with Mrs. Pickens, or the day following that, he saw Dever Pickens in Clarksburg, and appealed to him to marry Miss Dent, and save further trouble, and says: "He finally refused to marry her, and made me a very emphatic answer, saying if this matter was met in peace he would meet it in peace, but, if it was war, 'By God! it should be war,' was his answer. Just prior to that remark I had said to him, did he suppose that Miss Dent

and her friends would submit to this trouble, if he didn't marry her, without a suit." Mrs. Boring does not negative on the witness stand the fact that she had full knowledge of the fraud and fraudulent intent on the part of Dever in the execution of the deed of trust which secured her. The trustees in said deed of trust, Messrs. Davis and Dayton, although parties to the suit and served with process, and although charged with full knowledge of fraud and fraudulent intent in the execution of said deed of trust, failed to appear and answer the bill, or either of the amended bills. As to the trustees the bill and amended bills were taken for confessed. In *Merchandise Co.* v. *Laird*, 37 W. Va. 687, (17 S. E. 188,) it is held: "In this State the trustee in a deed of trust or assignment made to secure creditors is regarded as a purchaser for value, and, in order to make void the deed, notice of the grantor's fraudulent intent must in some way be brought home to him or to the creditors." The proof in the record shows that the trustees, Davis and Dayton, were the counsel of defendant Dever Pickens in the litigation between him and appellant from its inception, were at the time of the execution of the trust, and are yet even in this court on his appeal. In the case of *Johnston* v. *Zane's Trustee*, 11 Grat. 552, 562, which was a suit to set aside a deed of settlement as fraudulent, the court says, "To assail such a settlement successfully, an actual fraudulent intent must be manifested, or must be collected from the circumstances of the case." We are told by counsel for appellee that in the case last above cited (11 Grat.) "it is held that an answer by either the trustee or the beneficiary under the trust was sufficient to put in issue the allegations of the bill charging fraud." It is there held that (Syl., point 6): Upon a bill against a trustee and cestui que trust in a deed, the trustee answers and puts the allegations of the bill in issue, but the bill is taken for confessed as to the cestui que trust. The answer to the trustee protects the cestui que trust, and the plaintiff must prove his case as to both." In that case the trustee, a purchaser for value, answered and made the issue. Here the purchasers, although charged with full knowledge of, and participation in, the fraud and whose relations to the grantor were such as to make it certain that they had knowledge of his purpose and intention in execut-

ing the trust, refused to answer, but allowed the bills to
be taken for confessed as to them. Code, c. 125, section 36.
The only debt secured by the trust deed which is included
in the amount called eleven thousand dollars, which can be
classed as *bona fide*, is the note of Mrs. M. A. Pickens of Oc-
tober 1, 1887, for two thousand five hundred dollars, and that
is hardly above suspicion.   The trust deed, as to all the
debts secured to the estate of James Pickens, to R. M. Bor-
ing and to A. M. Pickens as to the note of two thousand one
hundred and thirty-nine dollars, must be set aside as fraud-
ulent as to the judgment of appellant.

    As to the marriage contract of May 10, 1889, the facts
and circumstances clearly proved show that Minnie B. Co-
burn lived in the neighborhood where the courtship of De-
ver Pickens and appellant was carried on, and knew of his
attentions to her.   She had met them together, and he had
taken appellant to Coburn's to see Miss Minnie Coburn in
May, 1887; and Miss Coburn had remained in the neighbor-
hood until the 13th of November, 1888, ten months after
appellant's child was born, and about that long after the
action was brought by appellant, right in the midst of the
gossip that was constantly going on in all that section
about it, and it was kept before the public by the local
newspapers of some two or three counties, and the fact of
the birth of the child was very improperly and immodestly
called to her personal attention, so that the subject was
constantly kept before her, *nolens volens*.   And she does
not deny, in her answer, the allegation of the bill that she
had notice of the pendency of the suit at law.   In the face
of all these facts, Dever enters into this contract with her,
transferring to her not only all his personal effects, includ-
ing, specifically, his *choses in action and evidences of debt*
in amounts even down to twenty dollars, but including a
mere equity of redemption in other plainly fraudulent
transfers made by him and mentioned and set out in the
contract with her.   And while she denied in her answer to
the allegations of the bill that she had knowledge of the
fraudulent intent of Dever in thus transferring his prop-
erty and reducing himself to utter insolvency so suddenly,
and so soon after a prosperous career of active business in
large transactions, she fails to testify in the case to make
her position clear, if she might, and, by subjecting herself

to cross-examination, bring to light all that she knew concerning the matter. These things have to be looked at reasonably, and from a common-sense point of view. To say that a lady of her intelligence, living where she was, surrounded and environed as she was, did not know what object Dever Pickens had in stripping himself all at once of his property, which had given him, perhaps, the most commanding position, socially and financially, of any man of his age in the community, is simply to say that which is quite impossible is probable. In Goshorn's Ex'r v. Snodgrass, 17 W. Va. 717 (Syl. point 6), it is held, "Though the proof of fraud rests on the party who alleges it, circumstances may exist to shift the burden of proof from the party impeaching the transaction onto the party upholding it." The facts as proved in this case, unexplained, would lead any unprejudiced and disinterested person to believe that Minnie Coburn not only knew of the fraudulent intent of Dever, but was engaged in aiding him to escape the payment of any recovery appellant might have, and "yet she fails to testify with regard to the matter, and thus firmly clinches the inference of notice according to well-settled equitable principles." *Farley* v. *Baeman*, 40 W. Va. 540, 542, (22 S. E. 72); *Trust Co.* v. *McClellan*, 40 W. Va. 405, 413, (21 S. E. 1025); *Parker* v. *Valentine*, 27 W. Va. 677 (Syl. point 3); *Hefflebower* v. *Detrich*, Id. 16.

Much stress is laid upon the sanctity of the marriage contract by the appellee,—that the consideration of marriage, in an antenuptial contract, is of the very highest, to which I most readily and heartily assent; and the proposition is abundantly supported by the highest authority, including this Court, which holds that such contract cannot be impeached as fraudulent by existing creditors unless it be shown that both parties thereto participated therein, or had notice of fraudulent intent. *Boggess* v. *Richards*, Adm'r, 39 W. Va. 567, (20 S. E. 599.) We are told that: "The common law, though it abhors every sort of cheating, loves matrimony. Its principles all point towards it, when the circumstances of a case expose them to this attractive force." We must remember that in this case we have two antenuptial contracts to contend with, and to adjust the complications which bad faith, at least on the part of the double contractor, has brought about. While it is true that

the common law loves matrimony, it will not permit matrimony to be used by a guilty party to escape the consequences of his fraudulent, deceitful, and unlawful conduct.

In appellant's first amended bill, she assails the assignment of a certain claim of one thousand dollars to Mollie Pickens, sister of Dever, and the assignment of notes and other claims against other persons, his debtors, and makes such other debtors parties to this suit, and asks that they be inhibited from paying such debts to any person but the appellant. I find in the record the following admission made before a commissioner by the parties to this suit by their counsel: "It is admitted before the commissioner by the parties to this suit, by their said counsel, that of the debt of $2,050.89 decreed to Dever Pickens in the chancery cause of Franklin Maxwell against M. W. Coburn, etc., and J. N. B. Crim against M. W. Coburn, etc., mentioned in the foregoing deposition of Melville Peck, that in addition to the sum of $1,721.21 paid by him, as commissioner, on the 22d day of April, 1892, to Alston G. Dayton, attorney, as per a copy of his receipt exhibited in said deposition, parcel of said $2,050.89, the residue thereof, to wit, $886.84 with interest thereon from the 22d day of May, 1893, is now in the hands of Squire Crouse, the general receiver of the circuit court of Barbour county, paid to him under a decree entered in said court in the chancery causes of Franklin Maxwell against Arthur W. Martin, etc.. and is now subject to the order of said court therein." And it is claimed by the appellant that the debt of two thousand fifty dollars and eighty-nine cents mentioned in said agreed statement is, by virtue of the lien of the plaintiff's bill, and the docketed execution therein mentioned, liable to her judgment, and the same should be charged against the person paying the same, or receiving payment thereof, with notice of plaintiff's rights, and against the fund in the hands of said general receiver, to wit, the sum of eight hundred and eighty-six dollars and eighty-four cents, with interest, as stated in said agreement. This proposition is correct, as applying to the debtors mentioned in said assignment from the date of the filing of said first amended bill.

Defendant Mollie Pickens failed to answer, and the amended bills were taken for confessed as to her. *Clark*

v. *Figgins*, 31 W. Va. 156,) (5 S. E. 643); *Sweeney,* v. *Refining Co.*, 30 W. Va. 443, (4 S. E. 431.)

As to the sufficiency of the acknowledgment of the marriage contract by the said Minnie B. Coburn, I deem it immaterial. The marriage contract made between Dever Pickens and Minnie B. Coburn must be set aside, as fraudulent and void as to the judgment of appellant.

For the reasons herein given, the decree of the circuit court must be reversed, and the cause remanded, with directions to the circuit court to require the general receiver to pay over to the appellant the money in his hands on account of her judgment, and that the court take such further proceedings as may be necessary to sequester the rents, issues, and profits of the three hundred and ninety-six and one-half acres to the plaintiff's claim, subject only to the balance which may be due to A. M. Pickens on her claim of two thousand five hundred dollars, as a prior lien, or to sell all the right, title, and interest of said Dever Pickens therein, and to sell the tracts of 86 and 88 acres, and after paying the leins thereon created by the deed of trust of January 14, 1889, and not assailed in plaintiff's bill, the residue to be applied to appellant's judgment, and to refer the cause to a commissioner to ascertain and report what moneys due on the claims assigned by Dever Pickens from the parties mentioned in the amended bills as debtors to him, if any, have been paid since the filing of the first amended bill, by whom and to whom paid, and whether the one thousand dollars of the debt secured by the trust deed made by M. W. and Ledrue Coburn of October 21, 1885, secured to Dever Pickens, and mentioned in the said marriage contract as having been assigned to Mollie Pickens, has been paid to her since the filing of the first amended bill, and whether any or all of such moneys have been paid or not; that the court take proceedings to collect all such money as may not be shown, upon proper and sufficient evidence, to have been paid prior to the filing of the said first amended bill, to be collected from the persons who have since received it, or from the debtors who may not yet have paid what they owe; and that the same, as fast as collected, be applied to the judgment of appellant, until the same is satisfied.

But little has been added on the rehearing to what was insisted upon at the original hearing of the cause. The arguments then made have been emphasized, and somewhat intensified. A point is raised in the brief on rehearing as follows: "Second, what just reason is there for the harsh provisions of this decision against Mollie Pickens?" The brief then goes on to inform the court, dehors the record, that said Mollie was "an afflicted daughter of James Pickens, and a sister of Dever Pickens. The world is a silent one to her. She is deaf and dumb. She could not well testify in her own behalf,—in fact, could not at all. Her brother did. Her debt is not denied to have existed. Dever Pickens owed her the money. But under this decision she is held to have had knowledge of his fraudulent purpose, and must lose her debt; may even refund part of it paid in the interest of the appellant, who, no matter how much we may pity her, is neither so innocent in this sad business, nor so helpless in life, as she." If this is all true, it does indeed leave the defendant Mollie Pickens in bad condition, and she is to be pitied. But what can be done? She appears from the record to be an adult defendant, and is presumed to be in complete possession of all her faculties, the contrary not being shown, and no intimation of any affliction until it appears in this brief of counsel on rehearing. If there was reason for appointing a committee or guardian *ad litem* to attend to and look after the interests of the defendant Mollie Pickens in the case, a suggestion to the court would have been sufficient to have had her interests protected in the case. The bill charges directly her knowledge of fraud. She stands by after being duly served with process, makes no appearance or answer, the bill is taken for confessed as to her; and it seems that, while Dever Pickens and all the rest of the family had able counsel to assist them in circumventing the plaintiff in her efforts to recover something from Dever on account of her just recovery against him, this poor girl was overlooked, and left to care for herself as best she could. I think it will hardly be seriously contended that the court can go outside of the record to consider the unfortunate condition that defendants have gotten themselves into either

by their own negligence or by that of their counsel. We regard this statement of counsel concerning the defendant Mollie Pickens, her condition and relation to this suit, as disclosing a very remarkable state of affairs indeed. Here is a family who have proved their capacity to take care of themselves in the affairs of the world, intelligent, smart, and financially able to look after their every interest, and having in their service the best legal talent in their part of the State. One of their number, unfortunate in not possessing all her senses, and, in a sense, helpless and dependent, yet possessed in her own right of a considerable estate, is permitted by the other members of the family, as well as their counsel, to be in default, and placed in such condition as to be in great danger of losing a large proportion of her estate. It seems that, in their eagerness to save themselves, they overlooked the interests of their unfortunate sister. It is argued, too, that the estate of James Pickens could not have notice of fraud, and could not be a party thereto; that the dead man in his coffin could not know of or participate in the fraud charged. The estate was well represented by the defendant the executor John D. Pickens, one of the family, and there can be no question as to his knowledge of the intent and purpose of Dever, his brother. The question arising upon the marriage contract of May 10, 1889, is further argued upon rehearing, but about the same authorities relied upon as before. I see no good reason, with the additional light cast upon the matters at issue, for changing my opinion in the cause, and still think the decree should be reversed, and the cause remanded for further proceedings to be had therein as set forth in the original opinion.

Brannon, Judge:

I write this note, not for an opinion on the many points arising in the case, but only to say that by concurring in the decision I by no means intend to question the principles laid down in *Boggess* v. *Richards' Adm'r*, 39 W. Va. 567, (20 S. E. 599.) *Herring* v. *Wickham*, 29 Grat. 628, and *Snyder* v. *Grandstaff* (Va.) 31 S. E. 647; nor does Judge McWhorter. I think that even if Miss Coburn knew of Dever Pickens' seduction of Miss Dent, and his

promise to marry her, and her action, yet she could, by a *bona fide* marriage contract, look out for herself first, and receive a settlement upon herself of Pickens' property at the expense of Miss Dent; and this by reason of the peculiar force of a marriage contract. If, with knowledge of those things, she had purchased his property for money, it might be different, as she would be enabling him to convert his property into money, which he could seclude from Miss Dent's pursuit. But she gave no money; she gave person and life. Therefore, as the cases above say, the question is, did Miss Coburn have notice of Pickens' intent to defeat Miss Dent's recovery by this marriage contract? I admit that the other circumstances, though raising a strong suspicion of such notice on her part, are not conclusive; but when you add to them the fact that she failed to give evidence and submit to a cross-examination as to her good faith, the case grows much stronger. If she had no knowledge of his purpose, why did she not pledge her sworn testimony to it? This decides me. Neither did he testify. As to those claiming under the trust deed: The bill charges fraud in its execution, and that the trustees, who were counsel for Pickent in Miss Dent's action at law, knew of the fraudulent intent. They do not answer to deny this. Notice to a trustee is notice to a creditor. It is urged that the creditors deny the fraud, and that this puts the matter in issue. It is said that as *Johnston* v. *Zane's Trustee,* 11 Grat. 552, holds that an answer of the trustee, denying fraud puts it in issue, so the answer of a creditor does. It does not follow. The trustee represents the creditor. But, when you fix notice on the trustee, why does not that fix it on the creditor, whether he tells him or not, as notice to the trustee is notice to the creditor? "The participation of either the trustee or the beneficiary of a deed of trust in the fraud of the grantor is sufficient to avoid the deed." *Crow* v. *Beardsley* 68 Mo. 345. There are, however, other circumstances against the deed of trust; but, if I am right as to the effect of notice to the trustee, these circumstances are not necessary, but strengthen the case.

*Reversed.*